IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AEROTEK, INC.,                                              :

      Plaintiff and Counter-Defendant,        :

v.                                                         :      Civil Action No. GLR-17-926

CHRISTINE M. OBERCIAN,                                     :

      Defendant and Counter-Plaintiff.         :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Christine M. Obercian's Motion for Partial Summary Judgment (ECF No. 41) and Plaintiff Aerotek, Inc.'s ("Aerotek") Cross-Motion for Summary Judgment (ECF No. 48). This employment dispute arises from Obercian's December 1, 2016 departure from Aerotek and subsequent employment at Beacon Hill Staffing Group, LLC ("Beacon Hill"). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny in part Obercian's Motion and deny Aerotek's Cross-Motion.

## I.      BACKGROUND[1]

On January 13, 2014, Obercian began working for Aerotek, a Maryland company that provides recruiting and staffing services to companies across the United States. (Am.

---

[1] Unless otherwise noted, the facts outlined here are set forth in Aerotek's Amended Complaint (ECF No. 37). To the extent the Court discusses facts that Aerotek does not allege in its Amended Complaint, they are uncontroverted and the Court views them in the light most favorable to the non-moving party. The Court will address additional facts when discussing applicable law.

Compl. ¶¶ 3, 7, ECF No. 37). Aerotek hired Obercian for the position of Operations Manager of Clinical Solutions for its affiliate, Aerotek Scientific, LLC, in Wayne, Pennsylvania. (Id. ¶¶ 13–14). In her role as Operations Manager, Obercian focused on the life sciences field and oversaw particular clients and engagements. (Id. ¶ 14; McKenna Dep. 13:4–7, May 30, 2018, ECF No. 44-2 (sealed)).

On her first day of employment with Aerotek, Obercian signed an Employment Contract (the "Agreement") that contained three provisions which form the core of this dispute: a Noncompete Provision, a Nonsolicitation Provision, and an Early Resolution Conference ("ERC") Provision. (Am. Compl. ¶¶ 23–29). Under the Noncompete Provision, Obercian may not:

> [F]or a period of eighteen (18) months [after termination of employment] . . . directly or indirectly engage in or prepare to engage in, or be employed by, any business that is engaging in or preparing to engage in any aspect of AEROTEK's Business for which [Obercian] performed service or about which [Obercian] obtained Confidential Information during the two (2) year period preceding termination of [Obercian's] employment, within a radius of fifty (50) miles from the office in which [Obercian] worked at the time [Obercian's] employment terminated or any other office in which [Obercian] worked during the two (2) year period preceding termination of [Obercian's] employment.

(Id. ¶ 24; Def.'s Mot. Summ. J. ["Def.'s Mot."] Ex. 4 ["Agreement"] ¶ 3, ECF No. 41-4). The Nonsolicitation Provision prohibited Obercian from:

> [c]ommunicat[ing] with any individual, corporation or other entity which is a customer of AEROTEK and about which [Obercian] obtained Confidential Information or with which [Obercian] did business on AEROTEK's behalf during the two (2) year period preceding termination of [Obercian's] employment for the purpose of (i) entering into any business

relationship with such customer of AEROTEK if the business relationship is competitive with any aspect of AEROTEK's Business for which [Obercian] performed services or about which [Obercian] obtained Confidential Information during the two (2) year period preceding termination of employment, or (ii) reducing or eliminating the business such customer conducts with AEROTEK.

(Am. Compl. ¶ 24; Agreement ¶ 4). The ERC Provision required Obercian to give Aerotek:

[W]ritten notice at least fourteen (14) days prior to (a) violating [the Noncompete Provision or Nonsolicitation Provision][2]; and/or (b) challenging the enforceability of [the Noncompete Provision or Nonsolicitation Provision] (including subparts), and will participate in a mediation or in-person conference if requested to do so by AEROTEK within thirty (30) days of such a request in order to help avoid unnecessary legal disputes. Should [Obercian] fail to comply with this Paragraph's notice or mediation/in-person conference requirement, [Obercian] acknowledges and agrees that such failure will serve as a waiver of [Obercian's] right to challenge the enforceability of [the Noncompete Provision or Nonsolicitation Provision].

(Am. Compl. ¶ 27; Agreement ¶ 13). In September 2014, Obercian transitioned to the role of Practice Lead. (McKenna Dep. 13:19–14:13). As Practice Lead, Obercian acted as a liaison between various Aerotek departments to support customers' needs. (McKenna Dep. 13:11–18).

On December 1, 2016, Obercian resigned from Aerotek. (Am. Compl. ¶ 30). Around December 5, 2016, Obercian began working for Beacon Hill as a Division Director of the Beacon Hill Pharma division. (Id. ¶ 33). In her position at Beacon Hill, Obercian recruited and placed individuals in positions with Beacon Hill clients. (Id. ¶ 34). She

---

[2] The ERC Provision involves two additional provisions not relevant to this case.

worked in Beacon Hill's King of Prussia, Pennsylvania office, which is located approximately ten miles from her former Aerotek office. (Id. ¶ 36).

On April 6, 2017, Aerotek sued Obercian. (ECF No. 1). On June 5, 2018, Aerotek filed an Amended Complaint. (ECF No. 37). Aerotek's Amended Complaint alleges a single Count: breach of contract (Count I). (Am. Compl. ¶¶ 39–48). Aerotek seeks injunctive relief and monetary damages. (Id. ¶ 48).

On June 20, 2018, Obercian filed an Answer to the Amended Complaint and Counterclaim (ECF No. 40). Obercian brings a single Counter claim, alleging a violation of the Maryland Wage Payment and Collection Law (the "MWPCL"), Md. Code Ann., Lab. & Empl. ["L&E"] §§ 3-501 et. seq. (West 2018) (Count I). (Countercl. ¶¶ 6–12, ECF No. 40). Obercian seeks monetary damages. (Id. ¶ 12).

Obercian filed her Motion for Summary Judgment on July 13, 2018. (ECF No. 41). On August 3, 2018, Aerotek filed an Opposition and Cross-Motion for Summary Judgment. (ECF No. 48). Obercian filed an Opposition and Reply on August 24, 2018. (ECF No. 52). Aerotek filed a Reply on September 24, 2018. (ECF No. 58).

## II.    DISCUSSION

### A.    <u>Standards of Review</u>

#### 1.    **Summary Judgment**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)).

Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact

arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

### 2. Cross-Motions for Summary Judgment

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." <u>Id.</u> (quoting <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996)). The Court, however, must also abide by its "affirmative obligation" to "prevent factually unsupported claims and defenses" from going to trial. <u>Drewitt v. Pratt</u>, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987)). If the evidence presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. <u>Anderson</u>, 477 U.S. at 249–50.

B.    **Analysis**

1.    **Obercian's Motion for Summary Judgment**

Obercian argues that the Court should grant summary judgment in her favor as to Aerotek's breach of contract claim because contract terms she allegedly breached—the Noncompete, Nonsolicitation, and ERC Provisions—are unenforceable. The Court first addresses the facial and factual enforceability of the Noncompete Provision.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." Taylor v. NationsBank, N.A., 776 A.2d 645, 651 (Md. 2001). Thus, if the restrictive covenants in the Agreement are unenforceable, Aerotek's claims would fail as a matter of law because there is no contractual obligation. The Court can, however, modify them to make them enforceable under Maryland's "blue pencil" rule.[3] Even so, a genuine dispute of material fact exists as to both the Noncompete and the Nonsoliciation Provisions. Accordingly, the Court will deny Obercian's Motion as to these provisions.

Under Maryland law,[4] whether a restrictive covenant is enforceable depends upon the unique language of the covenant at issue, Holloway v. Faw, Casson & Co., 572 A.2d 510, 515 (Md. 1990), and the specific facts of the case, Ruhl v. F.A. Bartlett Tree Expert

---

[3] "If a restrictive covenant is unnecessarily broad, a court may blue pencil or excise language to reduce the covenant's reach to reasonable limits." Deutsche Post Global Mail, Ltd. v. Conrad, 116 F.App'x 435, 439 (4th Cir. 2004) (citing Tawney v. Mut. Sys. of Maryland, 47 A.2d 372, 379 (Md. 1946)).

[4] Maryland law applies to this diversity action. See Nationwide Mut. Ins. Co. v. Welker, 792 F.Supp. 433, 437 (D.Md. 1992) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).

Co., 225 A.2d 288, 291 (Md. 1967). To be enforceable, a restrictive covenant must satisfy the following four requirements: "(1) the employer must have a legally protected interest"; "(2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest"; "(3) the covenant cannot impose an undue hardship on the employee"; and "(4) the covenant cannot violate public policy." Deutsche Post Global Mail, Ltd. v. Conrad, 116 F.App'x 435, 438 (4th Cir. 2004) (citing Silver v. Goldberger, 188 A.2d 155, 158 (Md. 1963)).

### a.    Noncompete Provision

### i.    Facial Enforceability

Obercian contends that the Noncompete Provision is overbroad because it would bar her from working for competitors of Aerotek, regardless of the scope of her position at the competitor. The Court agrees, but the overbroad portion of the provision can be excised, making Noncompete Provision enforceable. Because neither party argues that the Noncompete Provision violates public policy or imposes an undue hardship on Obercian, the Court will focus its discussion on Aerotek's legally protected interest and the Noncompete Provision's scope.

### aa.    Legally Protected Interest

Employers have a legally protected interest in ensuring that departing employees do not take advantage of the goodwill that they established for the employer with the employer's customers. Deutsche, 116 F.App'x at 438 (citing Silver, 188 A.2d at 159); Holloway, 572 A.2d at 515 ("Persons in business have a protectable interest in preventing an employee from using the contacts established during employment to pirate the

employer's customers."). Obercian does not dispute that she provided services for various Aerotek customers during her employment at Aerotek. (Obercian Dep. 50:10–13, 52:22–54:15, May 22, 2018, ECF No. 49-1 (sealed)). Thus, Aerotek has a legally protected interest in ensuring that Obercian does not abuse its goodwill.

### bb. Scope

The scope of Aerotek's Noncompete Provision must be no broader than is reasonably necessary to safeguard Aerotek's legally protected interest. Deutsche, 116 F.App'x at 438. Obercian has not challenged either the duration or the geographic scope of the Noncompete Provision.[5] The Court, therefore, focuses its inquiry on the breadth of the provision's proscriptions based on the "facts and circumstances" of this case. See Deutsche, 116 F.App'x at 438 (quoting Becker v. Baily, 299 A.2d 835, 838 (Md. 1973)).

Here, the Noncompete Provision contains two distinct proscriptions: (1) Obercian may not "directly or indirectly engage in or prepare to engage in . . . any aspect of AEROTEK's Business for which [Obercian] performed services or about which [Obercian] obtained Confidential Information" during the last two years of her employment at

---

[5] Nor could she, because under Maryland law, both the eighteen-month term and fifty-mile radius prescribed in the Noncompete Provision are enforceable. See, e.g., Allegis Group, Inc. v. Jordan, 2014 WL 2612604, at *6 (D.Md. June 10, 2014) (upholding nation-wide noncompete provision because the geographic scope was reasonable in light of the employer's national business); Padco Advisors, Inc. v. Omdahl, 179 F.Supp.2d 600, 606–07 (D.Md. 2002) (first citing Gill v. Comp. Equip. Corp., 292 A.2d 54, 49 (Md. 1972); then citing Tuttle v. Riggs-Warfield-Roloson, Inc., 246 A.2d 588, 589 (Md. 1968); and then citing Ruhl, 225 A.2d at 291) (upholding two-year noncompete provision); Intelus Corp. v. Barton, 7 F.Supp.2d 635, 641–42 (D.Md. 1998) (noting that Maryland courts determine whether the geographic scope of a restrictive covenant is reasonable by looking to the "specific facts" of the case (quoting Ruhl, 225 A.2d at 291)).

Aerotek; and (2) Obercian may not be "employed by [] any business that is engaging in or preparing to engage in any aspect of AEROTEK's Business for which [Obercian] performed services or about which [Obercian] obtained Confidential Information" during the last two years of her employment at Aerotek. (Agreement ¶ 3). The second proscription is impermissibly overbroad. It prohibits Obercian from working for any business that competes in the same areas that Obercian worked during her last two years at Aerotek without regard for Obercian's job at the competitor. Because this proscription is not tailored to positions or activities at a competitor that would allow Obercian to draw upon the goodwill that she generated for Aerotek, it is overbroad and not reasonably necessary to protect Aerotek's interest in preventing loss of goodwill. See Seneca One Fin., Inc. v. Bloshuk, 214 F.Supp.3d 457, 463 (D.Md. 2016) (concluding that a noncompete provision barring employee from engaging in the "same or similar [b]usiness" was overbroad because it was not properly tailored to the work the employee performed for the employer); Medispec, Ltd. v. Chouinard, 133 F.Supp.3d 771, 775 (D.Md. 2015) (concluding that a noncompete provision that prohibited an employee "from taking any job, no matter how unrelated to his prior sales work" with a competitor was "overly broad and not reasonably targeted to achieve [the employer's] stated interest in protecting its goodwill").

Aerotek argues that the Court, in Allegis Group, Inc. v. Jordan, No. GLR-12-2535, 2014 WL 2612604 (D.Md. June 10, 2014), and two other district courts, in TEKsystems, Inc. v. Lajiness, No. 12 C 10155, 2013 WL 3389062 (N.D.Ill. July 8, 2013), and in Aerotek, Inc. v. Thompson, No. 6:13-cv-1277-Orl-22KRS, 2015 WL 12806598 (M.D.Fl. Feb. 20, 2015), have upheld this language as enforceable. The Court disagrees with Aerotek's

reading of these cases. <u>Allegis</u> interpreted the first proscription in Aerotek's Noncompete Provision, holding that a similar noncompete was enforceable against an employee who founded his own competing businesses after leaving Aerotek. <u>Allegis</u>, 2014 WL 2612604, at *2–3, 6–7. <u>Allegis</u> explicitly noted that it was not addressing the enforceability of the proscription in the Noncompete Provision that applied to employees who left Aerotek for a competitor. <u>Id.</u> at *10.

Neither <u>Thompson</u> nor <u>Lajiness</u> are binding on the Court, and the Court is not persuaded by their reasoning for at least two reasons. First, <u>Thompson</u> adopts <u>Allegis</u>'s conclusion without any discussion of how the factual distinctions between the cases affect the court's consideration of the provision's enforceability. Specifically, the employee in <u>Allegis</u> founded his own company, whereas the employee in <u>Thompson</u> left Aerotek to work for a preexisting business. <u>Allegis</u> and <u>Thompson</u>, therefore, implicate different proscriptions in the Noncompete Provision—the first and second proscription, respectively. <u>Compare</u> <u>Allegis</u>, 2014 WL 2612604, at *3, <u>with</u> <u>Thompson</u>, 2015 WL 12806598, at *4. Second, both <u>Lajiness</u> and <u>Thompson</u> depart from a fundamental principle of contract interpretation: "courts should avoid interpreting contracts so as to nullify their express terms." <u>Calomiris v. Woods</u>, 727 A.2d 358, 366 (Md. 1999). Interpreting the second proscription of the Noncompete Provision as a mere prohibition on holding a position with a competitor that involves the same work the employee did at Aerotek could make the first proscription superfluous. Under this reading, both proscriptions would bar an ex-Aerotek employee from engaging in the same work that they performed at Aerotek. The Court, therefore, declines to adopt the reasoning of either <u>Lajiness</u> or <u>Thompson</u>.

Thus, the Court concludes that the second proscription in the Noncompete Provision is overbroad, and therefore, unenforceable. But this is not the end of the Court's analysis.

"'[B]lue pencil' excision of offending contractual language without supplementation or rearrangement of any language is entirely in accord with Maryland law." Fowler v. Printers II, Inc., 598 A.2d 794, 802 (Md.Ct.Spec.App. 1991). A court may, however, only excise a provision that is "neatly severable." Deutsche, 116 F.App'x at 439. If two provisions of a noncompete are distinct, divisible promises, a court may excise the offending provision. Id. If two promises form a "single indivisible promise" though, the court cannot remedy the defect by excising the overbroad provision. Id.

Here, the Noncompete Provision contains two divisible promises. The first prohibits direct or indirect engagement in the same area or type of work that an employee engaged in while at Aerotek. The second prohibits an employee from working for a business that engages in the same type of work that the employee was engaged in while at Aerotek, regardless of the employee's role at that business. The second proscription is not illustrative of or indivisible from the first. Instead, it is separated from the first proscription by the word "or,"[6] indicating that these are two distinct promises. Cf. id. (reasoning that the word "including" indicates that two parts of a restrictive covenant form one indivisible promise). Because the first proscription and the second proscription are two distinct promises, the

---

[6] Under the provision, Obercian may not "directly or indirectly engage in or prepare to engage in, or be employed by, any business that is engaging in or preparing to engage in" the work that Obercian performed or learned confidential information about during her last two years at Aerotek." (Agreement ¶ 3 (emphasis added)).

Court will excise the offending provision—the second proscription—from the Noncompete Provision.

After this excision, the Noncompete Provision reads:

> [F]or a period of eighteen (18) months [after termination of employment] [Obercian] shall not directly or indirectly engage in or prepare to engage in any aspect of AEROTEK's Business for which [Obercian] performed services or about which [Obercian] obtained Confidential Information during the two (2) year period preceding termination of [Obercian's] employment, within a radius of fifty (50) miles from the office in which [Obercian] worked at the time [Obercian's] employment terminated or any other office in which [Obercian] worked during the two (2) year period preceding termination of [Obercian's] employment.

Thus, under the remaining proscription in the Noncompete Provision, Obercian is prohibited from working in the same areas that she either worked in or learned confidential information about during her last two years at Aerotek.

### ii. Factual Enforceability

Obercian next argues that no genuine dispute of material fact exists regarding her alleged violation of the remaining proscription in the Noncompete Provision. The Court disagrees.

A genuine dispute of material fact exists as to the scope of Obercian's duties at Aerotek, and, therefore, the overlap, if any, between her work at Aerotek and her position at Beacon Hill. Obercian argues that at Beacon Hill she focused solely on staffing, (Obercian Dep. 214:1–4), and that the work she performed at Aerotek centered on "a service that's provided to companies in the research industry that is completely separate and different in every way, distinguished in every way from staffing." (Id. 53:1–5; 53:11–

13). She emphasized that Aerotek was providing "platforms and systems and processes and documents. And that is what made us quite different from staffing." (Id. 55:10–13; Obercian Decl. ¶ 4, ECF No. 53-1 (sealed)). She testified that she "[r]arely" used her expertise to evaluate candidates while at Aerotek, (Obercian Dep. 56:8–15; 59:5; 312:7–17; 314:11–17), and that she "didn't recruit" candidates, (id. 56:18–19; Obercian Decl. ¶¶ 4–5). Instead, she focused on the "kind of solutions and services" that Aerotek clients required. (Obercian Dep. 59:5–9).

Aerotek, for its part, underscores that Obercian was responsible for reviewing the resumes of individuals who might be able to fill positions with Aerotek's clients. (Id. 59:22–61:2; 312:18–23). Aerotek also emphasizes that Obercian was "a mentor to [the] recruiting team," and that she chose to sit in proximity to the recruiters to "interact and understand" their work, in order to "act as a mentor and advise them." (McKenna Dep. 34:21–22; 35:15–36:5).[7]

Thus, viewing the evidence in a light most favorable to Aerotek, the Court concludes that there is a genuine dispute of material fact as to Obercian's job duties during the relevant time period. As a result, the Court cannot conclude, as a matter of law, that Obercian did not violate the Noncompete Provision. Accordingly, the Court will deny Obercian's

---

[7] But see Obercian Decl. ¶ 4. McKenna also discussed Obercian's duties as Project Manager before she transitioned to the position of Practice Lead in September 2014. (McKenna Dep. 15:9–17:20). The Noncompete Provision only prohibits Obercian from engaging in the type of work that she performed at Aerotek during the two years preceding her departure. Obercian's last day at Aerotek was December 1, 2016, so only her work from December 1, 2014 to December 1, 2016, is relevant for this analysis. Accordingly, the Court focuses solely on the parts of McKenna's testimony that relate to Obercian's work from December 1, 2014, to December 1, 2016.

Motion as to the Noncompete Provision. The Court next addresses the facial and factual enforceability of the Nonsolicitation Provision.

### b.    Nonsolicitation Provision

Obercian challenges the Nonsoliciation Provision in the Agreement as overbroad and, therefore, unenforceable. She also contends that no genuine dispute of material fact exists regarding her alleged breach of the provision. The Court first considers whether the Nonsolicitation Provision is enforceable.

### i.    Facial enforceability

Obercian argues that the Nonsolicitation Provision is unenforceable because it prohibits Obercian from soliciting both actual and prospective Aerotek customers. The Court disagrees with this reading of the provision.

"Construction of a contract is, in the first instance, a question of law for the court to resolve." Shapiro v. Massengill, 661 A.2d 202, 208 (Md.Ct.Spec.App. 1995) (citing Suburban Hosp. v. Dwiggins, 596 A.2d 1069, 1075 (Md. 1991)). Maryland follows the objective law of contract interpretation. Gen. Motors Acceptance Corp. v. Daniels, 492 A.2d 1306, 1310 (Md. 1985). Consequently, where the language of the Nonsolicitation Provision is plain and unambiguous, the Court will presume the parties meant what they expressed. See id. A written contract is unambiguous if, when read by a reasonably prudent person, it is not susceptible to more than one meaning. See Calomiris, 727 A.2d at 363 (citing Heat & Power Corp. v. Air Prods. & Chems., Inc., 578 A.2d 1202, 1208 (Md. 1990)). Courts have found restrictive covenants that bar the solicitation of prospective customers overbroad and unenforceable because prospective customers have not yet

conducted business with the employer, and therefore the employee has not generated any goodwill with the customer on the employer's behalf. <u>Seneca One</u>, 214 F.Supp.3d at 464; <u>Paul v. ImpactOffice LLC</u>, No. TDC-16-2686, 2017 WL 2462492, at *6 (D.Md. June 6, 2017).

Here, the Nonsolicitation Provision, in relevant part, prohibits Obercian from: "[c]ommunicat[ing] with any individual, corporation or other entity which is a customer of AEROTEK" under certain circumstances. (Am. Compl. ¶ 24; Agreement ¶ 4). The parties agree that the term "customers" is not defined in the Agreement.[8] Obercian argues that Aerotek defines customer to include a prospective customer, even if Aerotek never bills these prospective customers for any service. (Billingslea Dep. 14:5–20, May 30, 2018, ECF No. 44-1 (sealed)). Aerotek counters that it would defer to the dictionary definition of customer. (Billingslea Dep. 51:6–52:2, May 30, 2018, ECF No. 49-12 (sealed)).

In this case, a reasonably prudent person would likely understand the term "customer" to have a single meaning: someone who has conducted business with Aerotek. Because the Agreement's language is clear, and, compellingly, because Aerotek does not argue that the Nonsolicitation Provision should apply to prospective customers, the Court concludes that the Nonsoliciation Provision does not apply to prospective customers. Because Obercian does not challenge the facial enforceability of the Nonsolicitation Provision on any other grounds, the Court further concludes that the Nonsolicitation Provision is enforceable.

---

[8] (Mem. L. Supp. Def.'s Mot. Summ. J. at 21, ECF No. 43; Mem. L. Supp. Pl.'s Cross-Mot. Summ. J. at 24, ECF No. 49).

## ii.    Factual Enforceability

Obercian argues that no genuine dispute of material fact exists regarding her alleged breach of the Nonsolicitation Provision. The Court disagrees.

The Nonsolicitation Provision bars Obercian from communicating with any Aerotek customer that she either learned confidential information about while at Aerotek, or that she did business with on Aerotek's behalf during the two years prior to her departure. (Agreement ¶ 4). The provision does not, however, bar all communications. It only bars communications with such Aerotek customers under two circumstances: (1) when the communication is made for the purpose of "entering into any business relationship" that is competitive with any aspect of Aerotek's business that the employee either worked in, or about which the employee obtained confidential information during the two years preceding the employee's departure; or (2) when the communication aims to "reduc[e] or eliminat[e] the business such customer conducts" with Aerotek. (Id.).

Aerotek alleges that Obercian violated the Nonsolicitation Provision by meeting with Alcobra Pharma ("Alcobra"), an Aerotek customer, while working at Beacon Hill. Obercian does not dispute that she worked with Alcobra while she was employed at Aerotek, or that she subsequently met with Alcobra when she was employed by Beacon Hill. (Obercian Decl. ¶ 16). She contends, however, that this meeting did not violate the Nonsoliciation Provision because she did not meet with Alcobra for the purpose of entering into a business relationship with Alcobra or for reducing or eliminating Aerotek's business with Alcobra. (Id. ¶¶ 14–16). Aerotek counters that Obercian identified Alcobra as a

prospective client of Beacon Hill, and therefore, she violated the Nonsoliciation Provision by meeting with them. (Obercian Dep. 286:4–289:20).

Thus, viewing this evidence in a light most favorable to Aerotek, there exists a genuine dispute of material fact as to whether Obercian met with Alcobra for the purpose of soliciting business while working for Beacon Hill, and, as a result, violated the Nonsolicitation Provision.

The parties also dispute whether Obercian violated the Nonsoliciation Provision by conducting business, on Beacon Hill's behalf, with Immunocore, an Aerotek customer that Obercian allegedly learned confidential information about during her time at Aerotek.[9] Obercian raises a twofold objection to the evidence Aerotek submitted in support of this alleged violation. Obercian argues: (1) the Court should not consider the declaration of Samantha Spieller (the "Spieller Declaration") and related evidence because Aerotek submitted this evidence after the Court's discovery deadline, thereby depriving Obercian of the opportunity to respond to this evidence; and (2) Aerotek has not established that Obercian obtained confidential information; instead, Aerotek demonstrates that Obercian could have accessed confidential information. The Court addresses Obercian's arguments in turn.

---

[9] Though one Aerotek official testified that Obercian performed services for Immunocore while at Aerotek, (McKenna Dep. 40:17–41:5), Aerotek does not argue that Obercian's subsequent contact with Immunocore while at Beacon Hill also constitutes a violation of the Nonsolicitation Provision. Instead, Aerotek only contends that Obercian breached the Nonsolicitation Provision because she had learned confidential information about Immunocore while at Aerotek, and subsequently worked with them while at Beacon Hill.

Obercian maintains that the Court should not consider evidence Aerotek submitted after the close of discovery. Specifically, Obercian notes that Aerotek designated Kevin McKenna as its Rule 30(b)(6) corporate representative who would discuss the work Obercian performed at Aerotek during the two years preceding her departure, not Spieller. (Am. Notice of Rule 30(b)(6) Dep., ECF No. 53-2). Obercian contends that McKenna was unprepared for his deposition and unable to provide specific information regarding Obercian's alleged work for Immunocore. (See McKenna Dep. 40:17–45:8). To supplement McKenna's testimony, and after the close of discovery,[10] Aerotek submitted the Spieller Declaration[11] to support its contention that Obercian accessed confidential information about Immunocore. In her declaration, Spieller states that she gave Obercian information about Immunocore. (Spieller Decl. ¶¶ 8, 11–12, ECF No. 49-11 (sealed)).[12] Aerotek has not provided the Court with any explanation for the belated submission of Spieller's Declaration and the documents Spieller references. Nor does Aerotek explain why it did not produce this evidence prior to the discovery deadline or identify Spieller as

---

[10] Discovery closed on May 31, 2018, (Apr. 18, 2018 Order, ECF No. 32), and Obercian asserts that Aerotek produced the Spieller Declaration for the first time on August 3, 2018, as an exhibit to its Cross-Motion for Summary Judgment, (Def.'s Opp'n at 13–15, ECF No. 53 (sealed); Spieller Decl., ECF No. 49-11 (sealed)). Aerotek does not dispute these facts.

[11] Spieller was not identified as a person with knowledge about Aerotek's claims in Aerotek's initial discovery responses. (Pl.'s Ans. 1st Set Interrogs. at 2–4, ECF No. 53-3).

[12] After producing the Spieller Declaration, Aerotek also belatedly produced several documents that Spieller referenced, (Obercian Decl. Exs. 1–2, ECF No. 53-1), and additional emails between Spieller and Obercian, (Obercian Dep. Ex 29, ECF No. 49-1 at 262 (sealed)). Obercian, however, disputes whether any of this information was confidential, and maintains that she never obtained confidential information about Immunocore. (Obercian Decl. ¶¶ 8–11).

a potential witness. Because Obercian did not have an opportunity to challenge this evidence during discovery and Aerotek has proffered no explanation for its tardiness, the Court will not consider the Spiller Declaration, or the documents referenced in the Spiller Declaration, in resolving this Motion. See Fed.R.Civ.Pro. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); see also Spotswood v. Hertz Corp., No. RDB-16-1200, 2019 WL 498822, at *5 (D.Md. Feb. 7, 2019) (citing Wilkins v. Montgomery, 751 F.3d 214, 222 (4th Cir. 2014)) (concluding that the Court has "broad discretion to determine whether a party's non-disclosure of evidence is substantially justified or harmless").

Based on the evidence presented during discovery, Obercian argues that Aerotek's evidence does not establish that she accessed confidential information about Immunocore. Aerotek counters that Obercian had access to two proprietary databases—the RWS database and Salesforce databases—that contain confidential information. (McKenna Dep. 78:21–79:9). But McKenna stated that he did not know what specific information Obercian accessed. (Id. 78:9–17). McKenna also noted that "everyone" at Aerotek should access RWS "at some point." (Id. 31:1–4). In addition, Aerotek submitted an email chain that demonstrated Obercian offered to speak about Immunocore during a business development call. (Obercian Dep. Ex. 29, ECF No. 49-1 at 270 (sealed)).[13] But the email does not

---

[13] Citations to Exhibit 29 to Obercian's deposition refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

demonstrate whether Obercian had access to confidential information about Immunocore, or whether she was merely well-versed on Immunocore's market performance. Thus, viewing this evidence in a light most favorable to Aerotek, there is no genuine dispute of material fact regarding whether Obercian accessed confidential information on Immunocore.

In sum, the Court concludes that there is no genuine dispute of material fact regarding whether Obercian violated the Nonsolicitation Provision in her interactions with Immunocore. A genuine dispute of material fact exists, however, as to Obercian's contact with Alcobra. Accordingly, the Court will deny Obercian's Motion as to the Nonsolicitation Provision. The Court now turns to the enforceability of the ERC Provision.

### c.    Early Resolution Conference Provision

Obercian argues that the ERC Provision is both procedurally and substantively unconscionable, and therefore, unenforceable. Aerotek counters that the provision is akin to an arbitration clause, which it contends is enforceable. The Court agrees with Obercian.

Under Maryland law, an unconscionable contract is void. See Walther v. Sovereign Bank, 872 A.2d 735, 743–44 (Md. 2005). In order to establish unconscionability, a party must demonstrate both procedural and substantive unconscionability. Id. at 743–44. Procedural unconscionability is evidenced by "one party's lack of meaningful choice." Id. at 743 (citing Black's Law Dictionary 1560 (8th ed. 2004)). Substantive unconscionability is evidenced by "contractual terms that unreasonably favor the other party." Id.

Contracts of adhesion that are "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it basis'" are procedurally unconscionable. Id. at 746. But

"[t]he fact that a contract is one of adhesion does not mean that either it or any of its terms are invalid or unenforceable." Meyer v. State Farm Fire & Cas. Co., 582 A.2d 275, 278 (Md.Ct.Spec.App. 1990). Instead, a contract of adhesion will be held invalid only if it is also substantively unconscionable. Walther, 872 A.2d at 746–47. The court must examine the contract with "special care" and examine "the substance of the particular provision at issue . . . to decide whether it is unconscionable." Id.

Although the ERC Provision requires mediation, not arbitration, the Court sees no reason to treat the ERC Provision differently because both are forms of alternative dispute resolution that often require parties to waive the right to bring suit in court. In addition, Aerotek likens the ERC Provision to an arbitration provision.

Maryland courts are clear: to be valid, an arbitration provision must be supported by consideration. Cheek v. United Healthcare of Mid-Atlantic, Inc., 835 A.2d 656, 661 (Md. 2003). A promise is consideration "only when it constitutes a binding obligation." Id. An illusory promise, which "does not actually bind or obligate the promisor to do anything," does not suffice as consideration. Id. at 662. To determine whether consideration exists, a court may only review the language of the arbitration provision itself. Id. at 664–65. In Cheek, the Court reasoned that allowing consideration in the underlying contract to remedy a lack of consideration for an arbitration clause would preclude the court "from ever finding an arbitration agreement invalid for lack of consideration when performance of a contract has already occurred, no matter how illusory the arbitration agreement was." Id. at 669. The same reasoning applies here. Further, as is

the case for an arbitration clause, evaluating the merits of the entire agreement would "eclipse the role of the [mediator], should a valid agreement exist." Id. at 668.

Here, Aerotek admits that employees were not permitted to "negotiate the language or terms" of the Agreement. (McKenna Dep. 57:5–7). The Agreement, therefore, is a contract of adhesion and is procedurally unconscionable under Maryland law. See Meyer, 582 A.2d at 278; Rose v. New Day Fin., LLC, 816 F.Supp.2d 245, 257 (D.Md. 2011). The Court must next consider whether the ERC Provision is substantively unconscionable.

Under the terms of the ERC Provision, Obercian must provide written notice, fourteen days in advance, of either violating the Agreement's Noncompete or Nonsoliciation Provisions, or challenging their enforceability. (Agreement ¶ 13). After receiving this request, it is within Aerotek's unilateral discretion to demand mediation. (Id.). If Obercian fails to comply with either the ERC Provision's notice requirement or Aerotek's request for mediation, she waives any right to challenge the enforceability of the Noncompete and Nonsolicitation Provisions. (Id.). The ERC Provision contains no parallel requirement that Aerotek submit to mediation at Obercian's request, or a commitment on Aerotek's part to mandatory mediation. Because this provision does not bind Aerotek, it lacks consideration. See Noohi v. Toll Bros., Inc., 708 F.3d 599, 610 (4th Cir. 2013) (concluding that an arbitration clause "lacks mutuality of consideration" because it "binds only Plaintiffs to arbitration"); United States v. Selective Ins. Co., No. GJH-18-209, 2018 WL 6621507, at * 3 (D.Md. 2018) (same); Raglani v. Ripken Prof'l Baseball, 939 F.Supp.2d 517, 522–23 (D.Md. 2013) (same). The ERC Provision is, therefore, substantively unconscionable because it is not supported by mutual consideration.

Thus, the Court concludes that the ERC Provision is both procedurally and substantively unconscionable, and, as a result, there is no genuine dispute of material fact regarding its enforceability. Accordingly, the Court will grant Obercian's Motion as to this provision.

### 2. Aerotek's Cross-Motion for Summary Judgment

Aerotek moves for summary judgment in its favor as to its breach of contract claim regarding the Noncompete, Nonsolicitation, and ERC Provisions and as to Obercian's MWPCL counter-claim.

#### a. Breach of Contract Claim

As discussed above, a genuine dispute of material fact exists as to both the scope of Obercian's duties at Aerotek and Obercian's interactions with Alcobra, and this does not change when the Court views the facts in a light most favorable to Obercian. There is, however, no genuine dispute of material fact that the ERC Provision is unenforceable. Accordingly, the Court will deny Aerotek's Motion as to the Noncompete, Nonsolicitation, and ERC Provisions.

#### b. MWPCL Counterclaim

Aerotek advances three arguments in support of their Motion for Summary Judgment on Obercian's MWPCL Counterclaim: (1) Obercian's bonus is not a "wage" under the statute; (2) assuming the bonus is a wage, Obercian did not fulfill the preconditions to earn her bonus; and (3) a bona fide dispute exists as to whether Aerotek owes Obercian her bonus. Obercian argues that a genuine dispute as to a material fact exists regarding her MWPCL claim. The Court agrees with Obercian.

Under the MWPCL, "each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." L&E § 3-505(a). The statutory definition of "wage" includes "a bonus." L&E § 3-501(c)(2)(i). Maryland courts have clarified, however, that "not all bonuses constitute wages." Medex v. McCabe, 811 A.2d 297, 302 (Md. 2002). Bonuses are wages "only if given in exchange for an employee's work." Mazer v. Safeway, Inc., 398 F.Supp.2d 412, 425 (D.Md. 2005). Where bonuses are "dependent upon conditions other than the employee's efforts, they lie outside the definition [of wages]." Medex, 811 A.2d at 302.

Aerotek argues that all of its bonuses are discretionary, and therefore, are not wages under the MWPCL. In support of this argument, Aerotek points to its Employee Handbook, which states:

> All performance bonuses for eligible employees, if any, are within the sole discretion of the Company . . . . Discretionary performance bonuses are not earned until an employee has performed in a satisfactory manner throughout the entire performance and evaluation period and a bonus amount, if any, has been determined. Accordingly, if separated employees have part of their compensation associated with a discretionary performance bonus, they are eligible to earn and receive such bonus only if they are actively employed throughout the entire performance and evaluation period. Employees whose employment is separated prior to the end of a performance and evaluation period are not eligible for a discretionary performance bonus, because such bonuses are not determined or earned until the conclusion of the performance and evaluation period.

(Pl.'s Cross-Mot. Summ. J. Opp'n ["Pl.'s Cross-Mot."] Ex D pt. 2, ECF No. 49-5 at 79 (sealed)).[14] Aerotek also points to Obercian's offer letter, which states: "You will be eligible for an annual bonus potential of up to $30.000.00 (subject to funding requirements as earned based on individual and company achievement versus goal.)." (Pl.'s Cross-Mot. Ex. A, ECF No. 49-1 at 189 (sealed)).[15] Obercian counters with her 2016 Compensation Letter, which sets forth an "EBR Bonus Potential" of $30,000.000 and, in great detail, outlines the sliding scale of goals that must be achieved in order to earn the bonus. (Def.'s Opp'n Pl.'s Cross-Mot. ["Def.'s Opp'n"] Ex. O ["2016 Compensation Letter"], ECF No. 53-7 (sealed)). Exhibit A to the 2016 Compensation Letter identifies four goals—Clinical Solutions Aggregate Spread, Clinical Solutions PIT spread, New Start/New Spread, and 8 New Client Wins—that account for 30%, 30%, 20%, and 20% of the $30,000.00 EBR Bonus Potential, respectively. (Id. at 3). The 2016 Compensation Letter makes no mention of Aerotek retaining discretion over the bonus. Furthermore, the four identified goals cumulatively account for 100% of the EBR Bonus Potential, leaving nothing to Aerotek's discretion. By its plain language, therefore, the 2016 Compensation Letter provides no indication that Obercian's bonus is discretionary. Instead, a reasonable reader would likely conclude that the bonus accrues once Obercian achieved the identified goals. Calomiris, 727 A.2d at 363.

---

[14] Citations to Exhibit D part 2 of Aerotek's Cross-Motion refer to the pagination CM/ECF assigned.

[15] Citations to Exhibit A of Aerotek's Cross-Motion refer to the pagination CM/ECF assigned.

Thus, a genuine dispute of material fact exists as to whether Obercian's bonus was discretionary, and therefore, was not wages under the MWPCL.[16] Accordingly, the Court will deny Aerotek's Motion as to Obercian's Counterclaim.

Thus, a genuine dispute of material fact exists as to whether Obercian's bonus was discretionary, and therefore, was not wages under the MWPCL.[17] Accordingly, the Court will deny Aerotek's Motion as to Obercian's Counterclaim.

### III.    CONCLUSION

For the foregoing reasons, the Court will: (1) grant in part and deny in part Obercians's Motion for Summary Judgment as to Count I (ECF No. 41); and (2) deny Aerotek's Motion for Summary Judgment as to Count I and Obercian's Counterclaim (ECF No. 48). A separate Order follows.

Entered this 27th day of March, 2019.           _____/s/_____
                                                George L. Russell, III
                                                United States District Judge

---

[16] Because the Court concludes that a genuine dispute of material fact exists as to whether Obercian's bonus was discretionary, the Court does not reach Aerotek's alternative arguments.

[17] Because the Court concludes that a genuine dispute of material fact exists as to whether Obercian's bonus was discretionary, the Court does not reach Aerotek's alternative arguments.